Well, our second and last case of this morning, number 14-4824 Oliver versus Roquet, Mr. Hughes, Mr. Pogba. Take your time, whenever you're ready. Good morning, Your Honors. May it please the Court, Gerard Hughes, Deputy Attorney General for the Appellant Debra Roquet, with permission three minutes for rebuttal, Your Honor. That's fine. Thank you. This appeal presents what we believe to be an issue of first impression to this Court, and that is whether a clinician's treatment recommendation Can I just ask a dumb procedural question at the outset? Why did you file a motion for summary judgment instead of a 12C motion for judgment on the pleadings, if you're claiming qualified immunity? The motion was actually filed before an answer. So I think because there wasn't an answer, we could not have filed the motion for judgment. Did the Court invite a 12C motion at one point? It actually invited either, a 12B6 or a summary judgment motion. All right. Thank you. Your Honors, the issue of first impression is whether a clinician's treatment recommendation can constitute adverse action in a First Amendment retaliation claim. This is a purely legal issue, and it arises as part of a qualified immunity defense. For these reasons, this Court has jurisdiction to hear this appeal under the collateral order doctrine. We identified a couple of, we can come back and talk about the issue of jurisdiction, but we identified a couple of cases involving, raising questions whether this is conduct, whether it's speech, how it is that we should think about what needs to be shown for adverse action under our case law. Can you address those and reconcile, for example, Rausser and McLaughlin? Yes, I can. I believe there are a few reasons why Dr. Roquet is entitled to qualified immunity, and I think only one of those reasons hinges on this case being about a recommendation rather than a decision. And I think that argument flows from McLaughlin, where this Court held that when a defendant is alleged to have persuaded a third party to take an adverse action against the plaintiff, the defendant's conduct has to reach a level of viral and- Particularly virulent. Yes, Your Honor. Thank you. Amounting to a threat or coercion, which we clearly don't have here. If we look at Dr. Roquet's report, it comes nowhere near that level. It's subjective. It talks about the treatment team's recommendations, why there's a disagreement, the reasons for that disagreement, and simply makes a recommendation to the body that sat above her. So I think McLaughlin leads this Court to the conclusion that Dr. Roquet is entitled to qualified immunity because her recommendation in no way amounted to a threat or coercion. That was a case where the recommendation was being made by an entirely different, even government, the U.S. Attorney to the Attorney General. Here we're talking about a recommendation that is made by someone who, of necessity, by the way the process has been created, influences the process. We know from the guidance and the report in the record that that recommendation is what then informs CARP in making its recommendation. Why doesn't that make this a different situation, more like the ranking in SUPAN, you know, a thumbs up or thumbs down that of necessity is going to have influence, as opposed to in dealing with the two separate, two truly separate entities where there is no combined process or a defined role for that recommendation in the process, where we have added these additional elements or characteristics that need to be shown? Well, first of all, in McLaughlin, yes, it was a different body. It was both part of law enforcement. Both entities were from law enforcement. But I think the more important point is that that's a distinction that while it may exist, it would not be expected that a reasonable official would understand that distinction. And that is the qualified immunity analysis. So I think your Honor is correct. There is a distinction, but I would not expect a reasonable government official to understand that distinction. Well, that goes to whether it's clearly established, but I assume it would be your preference for us to decide this on the first prong of qualified immunity, that is whether there was a violation and whether a recommendation in these circumstances, as a matter of law, could constitute an adverse action. I think that's correct. And I think that that goes to our other reasons for qualified immunity,  There are other contexts, for example, public employment, where a public employee certainly has a right to First Amendment expression, but that right is not unqualified. And a public employer can curtail that right if the employer has legitimate interest in the effective workings of government. And what I would respectfully suggest to the Court here is that, likewise, a clinician or a hospital certainly has a clinical interest, a legitimate clinical interest in curtailing speech in certain situations like we have here. So I think if there is a wholesale prohibition against a clinician factoring in a patient's speech and rendering a treatment recommendation, that's certainly a novel proposition. And I don't think it's a tenable proposition. Isn't the issue her speech, that is, at least for McLaughlin to apply, whether we view her report and recommendation as First Amendment speech? I think under McLaughlin, yes, the Court would. If you would have us apply that here, how would we reconcile that with Garcetti and that line of cases? That is, are we really going to say that public employees do not have a First Amendment right in their speech in connection with their employment to use it as a sword in bringing actions against the public employer, but they do have such a right when it comes to using it as a shield? What would support that? I'm sorry, Your Honor, I'm not sure I'm following that distinction. Well, we have said in Garcetti we've made the distinction between a public employee having First Amendment rights when they speak as a citizen, and then we proceed with a Pickering balancing analysis. Right. But if their speech is simply the speech that is part and parcel of their employment, then we've said that that is not a basis for them to bring in action for employment decisions that have been made on the basis of their performance and their right. Right. That that is not protected by the First Amendment. So the question then becomes when we have an employee in this situation, you seem to be asking us, if I understand you correctly, to recognize a First Amendment right that an employee could use as a shield for qualified immunity with reference to McLaughlin. But we've said in Garcetti it's not, that is, there's not a First Amendment interest, a First Amendment claim that can be brought where they can use it as a sword against a public employer. Right. Can both of those be true? I think what I'm suggesting is that there needs to be a test here, and I'm not saying it has to be the same test that's implied in the context of public employment, but there has to be a test by which a clinician's conduct is judged when she has a legitimate clinical interest in curtailing a patient's speech. And that's especially important in the context of sex offender treatment where it is vital for the patient to acknowledge his wrongdoings, to admit what happened, and even to change his thinking and his inclinations. So there absolutely cannot be a wholesale prohibition on a clinician factoring in those things when she's making a treatment recommendation. And what I'm saying is that test, whatever the court announces as the test, in no way could Dr. Roque have known what that would be. I invite my colleagues, I don't want to usurp all of their time, but that may be true when it comes to considering what the motivation was. But that, of course, raises questions of fact and would require discovery. If we are looking at this as a matter of law, we need to decide what adverse action means in this context. And we have cases that have said that it's enough for adverse action where the conduct in question would deter a reasonable person from the exercise of their First Amendment rights. If that's the case, then don't we need to take the more expansive approach because while it may not be factually true here, and discovery would bear that out, it can't be the case that we say as a matter of law that someone making a recommendation whose recommendation will certainly be considered in a final decision can do so on the basis of a retaliatory motive. Well, I don't think we get into retaliatory motive at this stage of the qualified immunity analysis. Right now, motive is irrelevant. So we're purely looking at objectively whether what is alleged can constitute adverse action in a First Amendment retaliation claim. But what's alleged is a retaliatory motive, so we can assume that. But I think that's the next question. And if I may quote this court in Grant, which was a case that was cited by the plaintiff actually in his primary brief, for the purposes of clarity, when we use the term state of mind and motivation, we are referring to the state of mind element of the underlying offense rather than to the question whether the public officials know they were violating clearly established rights. So I think the point is the court does not get into a state of mind analysis, and that evidence of state of mind is irrelevant until you get past the threshold issue of whether the alleged conduct violates clearly established rights. And I think the point is how is the court to judge Dr. O'Keefe's conduct in this case when there's no test about that conduct? To what extent, and maybe it's retreading on ground that's already been discussed, how is this case different from Rausser in which a recommendation of no parole passes muster as a possible claim that can go forward? Well, I think, first of all, we're dealing with a clinical decision, which we warn in Rausser, and we're also dealing with a highly nuanced clinical decision. But it's still a recommendation. In other words, the recommendation here was that the plaintiff not be put into Phase 3 for treatment, which was very important to him. And so how is this really? Yes, the facts are a different setting from Rausser to here, but isn't the principle or the theme much the same? I think in Rausser, the underlying First Amendment conduct in Rausser was abstaining from AA and NA based on religious grounds. So in that context, the state had no interest in curtailing that objection, whereas here there's clearly a clinical interest in curtailing certain speech in the context of sex-offended treatment. I think that's a very important distinction because if truly the only test here is whether her conduct could curtail or discourage certain speech, that's simply a disastrous result in the context of sex-offended treatment. I see my time is up here. Thank you. Thank you very much. Mr. Fogdahl. Good morning, Your Honors. May it please the Court, Steve Fogdahl as your amicus on behalf of Lorenzo Oliver. And I want to thank you on behalf of the Court for taking this as an amicus. Much appreciated. It's our pleasure. So I do firmly believe that this case should be decided on jurisdictional grounds, but given that the focus of the questioning has been on the merits issue of qualified immunity, I'll start with that if that's acceptable. The facts here, you have a nonbinding recommendation by a medical professional regarding the treatment of a civilly committed individual. And the question is, does her nonbinding recommendation, is it clearly established that this could be a constitutional violation? Well, yes, Your Honor, it does. This is not any ordinary clinical situation. This is a clinical situation in which this individual, Mr. Oliver, must progress through these phases of treatment in order to obtain his release from the STU. So this recommendation is a critical part, and at least this is what he alleges. It's Roquette's responsibility to evaluate individuals in terms of promoting them into the next phase of treatment, and he has to get into that next phase of treatment in order to complete the process so that he can obtain his release. So yes, there's a clinical component here, but there's also a very significant custodial component, and his liberty is being impacted by the clinical decision. The recommenders here were not, and I'm referring to the two members of the team who produced the TPRC. Yes. They were not actually clinicians providing direct treatment to him. That's my understanding. Indeed, the person or team who were actually recommended progression to the higher phase, did they not? Yes. So the TPRC recommendation was at odds with those who were actually offering him direct medical or psychological treatment. Yes. Your Honor, that's my understanding of the process here, that his actual treating doctors were not Dr. Roquette and the other doctor whose name is escaping me, but he had a clinical team that had recommended that he be promoted to phase three, and that Roquette and this other individual decided that he shouldn't be. But, I mean, I'm making some assumptions there simply because we haven't had any discovery, and so the actual treatment process here isn't entirely clear. It is clear that his treatment team recommended that he be promoted. It is clear that Roquette authored a report saying he shouldn't be. But it's not clear to me what, although the appellant has characterized Roquette's recommendation as non-binding and that this other body called CARB, which is Clinical Assessment Review Program or something like that, that that's actually the decision maker. That is their characterization of the process. I don't know that to be the case. For all I know, CARB just rubber stamps the decision of the TPRC. We don't know. What we do know is that we clearly have several levels in a process. Yes. But the actual interaction of those levels, one with another, or the authority of one vis-a-vis another, is not clear from the very, very, very limited record we have right now, which is the allegations. Precisely. And so what's being made here is really a causation, a fact-based causation argument. I mean, the argument is going to elevate. What facts, if any, could Oliver gain through discovery that would help us decide the qualified immunity analysis? Well, I think one relevant fact, Your Honor, is whether CARB just rubber stamps the decisions of the TPRC. I mean, if CARB is not an independent decision maker and that essentially once Dr. Roque issues her report recommending that he not be promoted, if that's essentially definitive as a practical matter. Does that really matter in terms of the determination as to adverseness? I mean, might it not be enough that the TPRC makes a recommendation which ultimately prevails, whether or not CARB's role is executed in a way that is no more than a rubber stamp? I think that's right, Your Honor. I mean, I think I agree with that way of characterizing it. Yeah. I mean, the allegation here is that when – If that's the case, discovery shouldn't be necessary on that point. Agreed. We ought to be able to determine, really as a matter of law, whether such a recommendation by TPRC constitutes adverseness or adversity, whatever is the appropriate terminology. Yes, yes. The allegation here is that this recommendation had the likely effect, and the allegation is that it was calculated to have the likely effect because there's an allegation of intent, retaliatory intent, that this recommendation was calculated to have the likely effect of prolonging Mr. Oliver's duration of confinement in the SDU. And I think that right there gets you adverse treatment. Counsel, we do need to take account of whether we have here a recommendation, an allegedly non-binding recommendation, or an actual decision. And don't we have enough just from the complaint and the documents that are referenced and incorporated into it, including the guide which lays out at page 56 of the appendix, how this process works, including the information that goes to CARP, the recommendation of the TPRC, but also other information, including from the treatment team, with the explanation that CARP is making this decision, and that this process, this flow of information, provides an increasingly independent assessment of treatment progress. Well, that's what the document says. That's a document that's technically outside the pleadings, and it's a characterization of the document. The allegation here is that Dr. Roque is the driving force in this process, that she was aware that Mr. Oliver was highly litigious and handing out his newsletter and all these other activities. She was aware of this. She specifically cited that activity in the report. I mean, here there's actually direct evidence of a retaliatory intent, because the report itself says this individual is legalistically focused. He's spending too much time on his paralegal work. He's got this newsletter. It's counter-therapeutic, and we want to make sure that he's not headed in a bad direction with this. So there's direct evidence that there's a clinical decision being made that Mr. Oliver not be promoted based on his litigation activity. Now, if CARP took that into account, then the decision, notwithstanding that it was made by CARP, it could still be improper. In fact, the fact that there's a decision being made based on litigation activity, right there raises constitutional concerns. But if we agree we're dealing with a recommendation, then why aren't we bound by McLaughlin, where there's not even in the complaint an allegation of some coercion or intimidation or particularly virulent conduct the way it was described in that case? Okay. So there's four things I want to say about McLaughlin. The first thing is in McLaughlin there was discovery. There was deposition. The Attorney General was deposed, and, in fact, the Court relies on that deposition in terms of characterizing the conversation that took place between the U.S. Attorney and the Attorney General. So there was discovery in McLaughlin, which is a major distinguishing factor. I mean, here we have not had any discovery at all. The second thing is, and Your Honor pointed this out in the first phase of the argument, McLaughlin is part of a line of cases that deals with where the adverse conduct by the defendant is itself protected speech. So here, what we're okay, there was a speech component here, obviously. I mean, I guess you could characterize the report and the recommendation as having a speech component, but it's not just speech. It's more like conduct. I mean, this is her official responsibility is to, as Oliver alleges, it's her official responsibility to make the assessment, make the recommendation to CARP, and it's an official recommendation being made that the claim is was dispositive in denying him promotion to the next phase. That's what's alleged. That's not simply speech. Now, if she'd sent an email to other folks in the SDU, other clinicians, or she'd written a memo to the file or something that said, I've been looking at Oliver and I think he's too litigious. I'm concerned about it. I think it's counter-therapeutic that he's filing all these lawsuits. That might be speech. And then maybe that would fit into the McLaughlin line. But this is, and I think that's what distinguishes Rausser from McLaughlin. Rausser is the recommendation is being made by the prison officials to the parole board. That's not just speech. That's an official action. And I think this fits into that same. So that's how I would reconcile Rausser and McLaughlin. But in your honor, I apologize. So there's two other things I want to say about McLaughlin. One is really McLaughlin is about that causation element. McLaughlin is saying that in that situation where the U.S. attorney is sort of voicing these kind of gripes about these individuals and saying we don't want these guys renting an office, we don't want them around, you know, and then the attorney general makes the decision that's supposed to be adverse. There the argument is, and I discourt hell in McLaughlin, that a reasonable official would not understand the causation element to be satisfied. The third element of a retaliation claim. That's what I mean by the causation element. So here, I mean, we're not at the statement. Maybe after discovery, maybe after discovery Roquette can make that argument that I wouldn't have given everything and just I was making this good faith clinical recommendation and I carved it its own thing. Maybe there you could say after that discovery that she couldn't, that a reasonable official in her position would not understand that the causation element was satisfied. And then I think you'd fit into McLaughlin. But we're not there yet. But with McLaughlin on the books, why at a minimum, you know, with these different lines of cases, is there not a lack of clarity such that a reasonable officer in Roquette's position would not understand that her recommendation to a different body that she is not part of and that is taking account of a variety of different pieces of information to make its decision violated First Amendment rights? Well, Your Honor, I really don't see Rausser and McLaughlin as being in conflict. I mean, they're really very different. Rausser deals with this situation. The question goes to the next point. Yes. Whether you're right or wrong, how is what Roquette did here a violation that they clearly established? Right. Understood. Understood, Your Honor. First of all, as Your Honor, Judge Krauss pointed out in the first phase of the argument, this is a situation where, and I understand and I want to step back. I am going to answer your question, Your Honor, but I want to step back and respond because this dovetails. I want to respond to the argument that when we're doing the qualified immunity analysis, when this Court is doing that analysis, that there's no account taken of motive or intent. If you look at what Crawford L. says, it's page 600 to 601 of Crawford L. What Crawford L. says is that it specifically rejects the dissent's position that in a case like this where intent is an element, that you just elide intent out of the analysis and all you look at is whether the conduct is, quote, objectively reasonable. The Court in Crawford L. specifically rejects that approach. And so the analysis here has to take into account all the alleged facts. One of the alleged facts is that Roquet acted in retaliation for the protected conduct. That is a fact that's assumed. And the question is, is it clearly established that that's improper? The answer is yes. This Court in Montero said it's never proper, it's never objectively reasonable to act with a prohibited constitutional intent. But Montero was dealing with a direct First Amendment claim. The question was whether there was viewpoint discrimination that led to the action of that council member being rejected from the meeting. Yes. We're dealing with a retaliation claim with different elements, and Crawford L. defines how we need to approach that. Right. Yes, that's right. That's right. So that language from Montero really is not apropos. We need to focus on what Crawford L. tells us about how to approach a retaliation claim and qualified immunity. Well, Your Honor, I don't understand what you're saying. In Crawford L., it's simply because the intent aspect of the conduct is part of the plaintiff's own case as opposed to being part of the affirmative defense of qualified immunity. And that's what Crawford L. is about. It's about the intent is part of the plaintiff's claim. It's an element of the plaintiff's claim. That doesn't mean that you ignore that when you're doing the qualified immunity analysis. I mean, the qualified immunity, what you're asking is, is it a violation of clearly established law prohibit retaliating based on litigation activity? In the context of a recommendation being made to a decision maker, that's the question that we need to decide. Is the law clearly established on that point? Two points on that, Your Honor. First of all, there's Rausser. I think Rausser is on point. It's a custodial situation where the effect of the recommendation, the likely effect, the calculated effect, is to prolong the individual's confinement. I think Rausser is right on point. So I'll start with that. The effect is, but there's some risk in relying too heavily on Rausser because it is, it discusses this issue in a very summary way and conflates the question of recommendation and decision making. In fact, at one point it just begins to talk in the language of this being the decision itself. There's no suggestion that was raised in the case, and it's not addressed by the opinion whether a recommendation stand alone to a separate decision maker constitutes adverse action. That's the question that's really been parsed out for us today. And I understood, Your Honor, but the correspondence between, and first of all, in terms of qualified immunity, there does not need to be a case directly on point. I mean, what the Supreme Court said in Hope, a general constitutional rule may apply with obvious clarity to the specific conduct in question, even though the very action in question has not been previously held unlawful. So we have to assume that Roquette knows she's acting with retaliatory intent. And if an official knows that she's acting with retaliatory intent, that official is going to understand that she's violating clearly established law. I mean, if you assume that she's acting with that intent, it's extremely difficult to see how she could think, I'm not violating clearly established law, notwithstanding that I am specifically doing this in retaliation for this protected conduct. Isn't that because McLaughlin says that it's not enough to act with specifically retaliatory intent when you're making a recommendation? Under those circumstances, there needs to be more, which translates into more even alleged at the pleading stage under McLaughlin, that is this threat, coercion, or other virulent behavior when you're dealing with a recommendation. Yeah. And I want to push back again on McLaughlin. McLaughlin is really about a situation where you have one independent actor, the U.S. Attorney for the Eastern District, talking to somebody completely separate, the State Attorney General, and saying, I don't like these guys. I don't want them in our office space. Get them out of there. Now, that's very different from a situation. None of that's part of his official duties. He's not making an official recommendation that's going to be part of the job review of these individuals or something like that. In this situation, we've got Roe K., who is, as part of her official duty, making a decision. Now, we can call it a recommendation, but it's a decision about whether or not he's going to be promoted. And you can say, well, it's a decision that gets reviewed by CARB and so on, but it's still very different from just sort of one individual who's completely separate from another individual saying, I just don't like these guys. I don't want them in our office space. Get them out of there. This is not Roe K.'s conduct here. It's not simply speech. She's not simply saying, I just think this guy's too lethicious. She's not saying that. She's making a recommendation that's part of her official duties that is alleged to be critical in whether Oliver is going to move into the next phase of treatment. So I really think that distinguishes this case from McLaughlin. Thank you very much. Okay, thank you, Your Honors. Appreciate it. Thank you. We have three minutes, is that right? That's correct. Okay. First, Your Honors, I believe what counsel is suggesting regarding the allegation of improper motive would negate the qualified immunity defense in any First Amendment retaliation claim where improper motive is alleged, which is clearly inconsistent with Crawford L. and its progeny. So that's the first point. The second point is that the only material alleged fact that's been alleged here is that Karp rubber-stamped the TPRC report, and that the TPRC report was actually not a recommendation. First of all. What is the process? I mean, other than we have it in the appendix, but in reality, is the process in fact different from what takes place or what is set out in the appendix? It is not, Your Honor. And I think the TPRC report was part of the complaint. It was actually cited in the complaint, so it is part of the record. It is quite clear that that report is an exercise of clinical judgment. It is also quite clear that it is a recommendation. So I think that's clear. I don't think it's disputed. To what extent can a recommendation, or do we know to what extent a recommendation from O.K. or somebody that would be in her position would not be followed by the group that ultimately makes that decision? If Karp had a clinical disagreement with Dr. O.K., then it could certainly overrule her recommendation. But we don't know to what extent they've ever disagreed? We don't. But I think if the allegation is that Karp rubber stamps these recommendations, that's an allegation against Karp and not against Dr. O.K. But I think there's an additional point here, and that is that this case does not, to the extent we're not talking to McLaughlin, this case does not turn on this being a recommendation versus a decision. Even if we assume this was a decision, it's still an exercise of clinical judgment. And I think the larger point, and maybe the more important point, is that there cannot be a wholesale prohibition on Dr. O.K. factoring in Oliver's being legalistic in her treatment recommendation. I mean, it's quite clear that's what she, that was part of what her recommendation was based on. There's no dispute as to that. But it's also quite clear that was an exercise of professional judgment. And the Supreme Court held in the case, it wasn't cited in the briefs, but the case Youngberg v. Romeo, it's a due process case. But the standard there is that this Court and other courts give deference to clinicians when they're rendering professional judgments. And what I would suggest to the Court here is that if there is a standard that's going to be announced that's going to govern this conduct in the future, there should be deference. Even if a clinician is factoring in First Amendment activity and making a treatment recommendation or a treatment decision, there has to be deference to that decision if it's an exercise of professional judgment. Counsel, even if we disagreed with the District Court on qualified immunity, does that relieve you of discovery given that there is a declaratory judgment claim and also state claims that are also pending? Well, first of all, I don't think that the state claims are materially different from the federal claims that are brought under the New Jersey Civil Rights Act. And I think the other state claims were dismissed. If I may go over, Your Honor, to answer your question. Go ahead. And the amended complaint also did not seek the injunctive relief of being elevated to Phase 3. So that's now a moot point. So I don't think that it's necessary for the District Court to rule on this case solely for declaratory judgment. But I also think that Dr. Roque, even if the court announces a test here that's going to govern these cases moving forward, I think her conduct is going to satisfy that test. Because I think it's clear from the report that her recommendation or decision, whatever we want to consider, it was an exercise of professional judgment. It's well thought out. It's objective. It's forthright. So I think it is going to satisfy any standard that this court announces. Thank you. Thank you very much. Thank you to both counsel for very well-presented arguments and also briefing. I know Mr. Fognerl, taking this case as amicus on short notice, and the briefing that you did was in your office, very well done. And much appreciated, both of you.